LENSCRAFTERS, INCORPORATED,
Plaintiff,

v.

Fredia WADLEY, in her Official capacity as Commissioner of the Tennessee Department of Health, et al., Defendants.

U.S. Vision, Cole Vision Corporation, and National Association of Optometrists and Opticians,

v.

Fredia Wadley, in her Official capacity as Commissioner of the Tennessee Department of Health, et al., Defendants.

Nos. 3:98–0150, 3:00–0096.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 16, 2003.

Order Granting in Part, Denying in Part Motion to Amend Opinion
Feb. 26, 2003.

Barbara Jean Moss, Wyatt, Tarrant & Combs, Nashville, TN, Stacey Leigh Jarrell, Julie A. Maloney, Thorp, Reed &

Armstrong, Pittsburgh, PA, Thorp, Reed & Armstrong, Pittsburgh, Barry Friedman, New York, NY, Kenneth Edward Pringle, Pringle, Quinn & Anzano, Belmar, NJ, for Lenscrafters, Inc., pltf.

Eugene N. Bulso, Jr., Barbara Hawley Smith, Melissa R. Ballengee, Boult, Cummings, Conners & Berry, Nashville, TN, for defts.

Raoul A. Renaud, Vision Service Plan, Rancho Cordova, CA, for Vision Service Plan.

Richard M. Smith, Smith & Cashion, PLC, Nashville, TN, for Gary Collins.

## *MEMORANDUM*

TRAUGER, District Judge.

Pending before the court are cross-Motions for Summary Judgment (Docket Nos. 163, 169) and responses thereto (Docket Nos. 197, 200) For the reasons discussed herein, the defendants' motion will be granted, and plaintiffs' motion will be denied.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *Evidentiary Matters*

As an initial matter, plaintiffs refer to a number of documents in support of their Motion for Summary Judgment, as well as their Response to the defendant's Motion for Summary Judgment, that defendants have objected to as inadmissible under Federal Rules of Evidence 802 and 901. (Docket No. 197 at pp. 1–2). Because some of these objections are well founded, the court will not consider the inadmissible documents, except to the extent that they are incorporated into plaintiffs' expert testimony.

In addition, defendants have moved to strike (Docket No. 209) Plaintiff's Statement of Material Facts in Support of Response to Motion for Summary Judgment (Docket No. 202), or in the alternative for relief from Local Rule 8(b)(7), which the plaintiffs have opposed (Docket No. 211). The court finds that the Plaintiff's Statement of Material Facts is not a concise statement of additional facts (being 202 pages in length) and is redundant with regard to many of the facts set forth in Plaintiffs's Statement of Undisputed Facts in support of their own Motion for Summary Judgment. However, in lieu of striking Plaintiffs' Statement of Material Facts in Support of Response to Motion for Summary Judgment, the court will grant defendants' relief from the Local Rule and will consider the additional facts set forth by the plaintiffs only to the extent the court is certain that those facts could not be disputed.

Finally, plaintiffs have filed a Motion to Supplement the Record (Docket 212), which defendants have opposed (Docket No. 219). Because this evidence has been proffered subsequent to the close of discovery, plaintiffs' motion will be denied.

### B. *Parties* [1]

Interstate optical firms, such as the plaintiffs, are businesses that employ licensed opticians.[2] The purpose of their businesses is to sell optical goods to consumers at the retail level. Plaintiffs operate retail optical stores in several states, including Tennessee.[3] In some states,

---

1. Unless otherwise noted, all facts have been drawn from Defendants' Response to Plaintiffs' Statement of Undisputed Facts (Docket No. 198) and Plaintiffs' Response to Defendants' Statement of Undisputed Facts (Docket No. 201).

2. NAOA is not a retailer but an industry trade group of which plaintiffs and other optical goods retailers are members. In this litigation, NAOA is representing the interests of its optical retailer members.

3. LensCrafters operates approximately 900 locations, which are located in 48 states.

plaintiffs sublet space and/or diagnostic equipment inside of their stores to licensed optometrists. In Tennessee, plaintiffs are prohibited from doing so by Tenn.Code. Ann. § 63–8–113(c)(6), which provides that:

(c) It is unlawful for any licensed optometrist to:

(1) Advertise optometric services or ophthalmic materials, except as provided in subsection (d);

(2) Practice optometry as an employee of any person or business or organization not engaged primarily in health care delivery;

(3) Practice optometry under a name other than the optometrist's own unless board approved;

(4) Appoint agents or other persons to take orders for optometric services or ophthalmic materials;

(5) Split or share fees with any person or organization in return for solicitation of customers by that person or organization;

*(6) Practice or offer to practice optometry in, or in conjunction with, any retail store or other commercial establishment where merchandise is displayed or offered for sale. Any licensed, registered optometrist practicing in premises of such type prior to April 17, 1967, shall be permitted to continue the independent practice in that optometrist's present location, or in such new location to which the retail store or other commercial establishment might move, but when any such optometrist vacates any such premises, no other optometrist shall be permitted to practice in such vacated premises;* or

(7) Engage in practice in any temporary or mobile office except as authorized by the board, or any office which does not have the appropriate instrumentation for diagnosis and treatment for the practice of optometry as established by the board.

Defendants Richt, Spivey, Hendrickson, Abernathy, Foster, and Browder are members of the Tennessee State Board of Optometry. Defendant Browder is the consumer member of the Board. The remaining members of the Board are Tennessee licensed optometrists.[4] Defendant Wadley is the Commissioner of the Tennessee Department of Health. All defendants are sued in their official capacities.

With respect to the Board's authority, Tenn.Code.Ann. § 63–8–112 provides in pertinent part:

The board is given authority to:

(1) Make rules, regulations, policies and procedures not inconsistent with the laws of this state, for the proper performance of its duties to carry out the purposes, and to enforce the provisions of this chapter;

(2) Provide a standard of efficiency as to the moral, educational and experience qualifications and fitness of all persons who desire to practice optometry in Tennessee, in conformity with the provisions of this chapter;

\* \* \* \* \* \*

(5) Investigate possible violations of and enforce the provisions of this chapter;

\* \* \* \* \* \*

---

LensCrafters opened its first location in Tennessee in 1984 and presently operates 20 locations in the state. U.S. Vision operates approximately 650 locations across the country. Most of these locations operate inside retail stores such as J.C. Penney and Sears. The remaining locations are free-standing stores.

Cole operates optical departments in Sears and Target stores and, through its affiliate, owns Pearle Vision Optical Superstores.

4. The optometrist members of the Board all sell optical goods incident to their practice of optometry.

(7) Seek injunctions to prevent violations of this chapter. Such actions shall be brought in the chancery court of Davidson County or the chancery court of the county in which the defendant resides or does business. Such actions may be brought by ten (10) or more licensed optometrists or a state association of optometrists as well as by the board[.]

The Department of Health is organized into divisions, among them the Division of Health Related Boards, which, concurrent with the Board of Optometry, is charged with enforcing the state's optometry laws.

## C. Retail Optical Market

Prescription optical goods are sold from a number of outlets in Tennessee. These outlets include interstate optical stores, local optical stores, health maintenance organizations (HMOs), and dispensaries operated by optometrists and ophthalmologists incident to their practice. Plaintiffs refer to the optometrists and ophthalmologists who operate such dispensaries as dispensing optometrists and ophthalmologists. For ease of reference, the court will as well, even though the term has no legal significance. Plaintiff's economic expert, Dr. Daniel L. Rubinfeld, estimates that the share of the retail market occupied by the different outlets is as follows:

| | |
|---|---|
| Dispensing Optometrists | 39.2% |
| Dispensing Ophthalmologists | 12.6% |
| Chains | 34.5% |
| Local optical stores | 10.9% |
| HMOs | 2.9% |

(Docket No. 163, Ex. 2 at p. 10) Dr. Rubinfeld's estimates are based upon data provided by Jobson's.[5] Defendants have offered unrefuted evidence that this data is often unreliable. (Docket No. 197 at pp. 17–19)

## D. Practice of Optometry in Tennessee

Tennessee regulates and licenses optometrists, ophthalmologists, and opticians. See Tenn.Code.Ann. §§ 63–8–101 (optometrists), 63–6–101 (ophthalmologists), and 63–14–101 (opticians). Optometrists are required to have earned a doctor of optometry (O.D.) degree to obtain licensure in Tennessee. Upon being licensed, optometrists are authorized to examine eyes, prescribe corrective lenses, diagnose eye disease, and prescribe drugs to treat eye disease.[6] Optometrists are also authorized to dispense optical goods incident to their practice of optometry. As stated, those who do so will be referred to herein as dispensing optometrists. Those who do not dispense optical goods incident to their practice will be referred to as prescribing optometrists.

Ophthalmologists are medical doctors who have specialized in the diagnosing and treating of the eye. In addition to performing the functions carried out by optometrists, ophthalmologists are authorized to perform eye surgery.

According to the Tennessee Supreme Court's decision in Lenscrafters, Inc. v. Sundquist, 33 S.W.3d 772 (Tenn.2000), Tennessee licensed optometrists are health care providers.[7] Retail optical goods es-

---

**5.** Jobson's provides an array of products and services to eyecare and eyewear professionals worldwide. The company gathers, analyzes and disseminates information and research about the ophthalmic industry, including market trends.

**6.** Optometry involves the diagnosis of ocular diseases and conditions. Through a compe-

tently performed eye examination, optometrists may detect the presence of medical conditions such as hypertension, diabetes, strokes, venereal disease, brain tumors, and multiple sclerosis.

**7.** The Tennessee Supreme Court decided LensCrafters in response to a certified question posed by this court concerning the applicabil-

tablishments are not health care providers. Rather, they are deemed "dispensing opticians" under Tenn.Code Ann. § 63–14–102. As such, plaintiffs are "allowed to prepare, adapt, and dispense lenses, spectacles, eye glasses, frames, and optical devices." *Id.* at 777. Businesses "in the practice of dispensing opticians" are also allowed to employ persons licensed as opticians, as long as the optician is "under the actual and personal supervision of partners, officers, managers or stockholders who possess valid unrevoked licenses as dispensing opticians entitled to practice in [Tennessee]." *Id.* (citing Tenn.Code Ann. § 63–14–103(d) (1997)). Thus, plaintiffs may sell ophthalmic lenses and frames and may employ opticians who dispense ophthalmic lenses and frames.

### E. Legislative History of Tenn.Code. Ann. § 63–8–113(c)(6)

The prohibition on optometric practice in or in conjunction with retail establishments was introduced to the Tennessee legislature in 1967 as Senate Bill 302 and House Bill 336. Proponents of the bill stated that the bill was designed to prohibit optometrists from working in commercial establishments.[8] They argued that the proscription was necessary because "[t]he public may suffer whenever commercial interests interfere with the doctor-patient relationship." Others stated that the bill would also "upgrade the profession" and professional standards. Some legislators opposed the bill on the grounds that it would not achieve its stated purposes and was apparently designed to protect the interests of optometrists who did

not practice in retail establishments. (Docket No. 163, Ex. 38 at pp. 35–36, 38)

An attempt to include a broad grandfather clause in the bill was defeated. One legislator explained the objections to the amendment as follows: "The situation is this, and the complaints that I heard during the interim recess were these: that the amendment would permit Sears & Roebuck & Co., Woolworth, Kresge's or other large establishments of this sort to perpetuate the department of optometry in their store." (Docket No. 163, Ex. 37 at p. 19)

### F. Effect of Tenn.Code.Ann. § 63–8–113(c)(6) on Plaintiffs

Plaintiffs' preferred business model is to sublease space inside of their stores to independent optometrists. Plaintiffs refer to the offering of eye examinations in the same place as eyewear is sold as "one-stop" eyecare.

Plaintiffs maintain that dispensing optometrists obtain a competitive advantage from their ability to offer one-stop eye care. They note that, if they wish for their customers to have nearby access to an optometrist, they must construct a physically separate optometrist's office with a separate entrance from outside of their retail stores. Plaintiffs refer to locations where the optometrist's office is physically separate from the optical dispensary as "two-door stores."

Sometimes, plaintiffs are unable to locate a space for the optometrist immediately next to their retail store. In such case, the optometrist's office may be locat-

---

ity of the challenged statutory provision to the plaintiffs.

**8.** There is no data regarding the number of out-of-state chain optical stores operating in Tennessee at the time the legislation was proposed. However, Dr. Rubinfeld states that, as of 1974, "mass merchants had no significant

penetration into the optical business, and chain optical firms accounted for a mere 10 percent of the market." (Docket No. 163, Ex. 2 at p. 12). Moreover, as recently as 1994, local optometric retailers accounted for approximately 20% of the market for retail optical goods. (Id. at p. 13)

ed several doors down or on a separate floor from the plaintiff's retail establishment.

Under Tenn.Code.Ann. § 63–8–113(c)(6), a Tennessee-licensed optometrist may not practice inside any retail store (as defined in *LensCrafters v. Sundquist*), whether it is owned by in-state or by out-of-state economic interests. Therefore, the effect of Tenn.Code.Ann. § 63–8–113(c)(6) upon the plaintiffs would be the same if they were domestic, Tennessee corporations.

### G. Costs of Complying With Tenn. Code.Ann. § 63–8–113(c)(6)

Plaintiffs assert that their inability to offer one-stop eyecare impermissibly burdens their ability to compete in the retail optical market and, in turn, interstate commerce.

First, plaintiffs assert that the prohibition against optometric practice in a retail setting "interferes with the interstate optical firm's ability to take advantage of certain economies of scope that accompany the provision of eye exams and eyewear in the same premises." (Docket No. 163, Ex. 2 at pp. 20–24) That is, retail optical stores could reduce expenses if they were allowed to share office staff, telephones, files, and storefront space with an onsite optometrist, engage in joint advertising, and offer combined customer service. Additionally, plaintiffs are unable to engage in techniques designed to increase sales of eyewear to eye exam patients, such as designing the layout of their offices to allow eye exam patients to browse their selection of frames while they wait for their exams.

Next, plaintiffs maintain that out-of-state chain optical stores would make up a larger share of the retail optical market if Tennessee did not prohibit them from offering one-stop eyecare. (Docket No. 163, Ex. 2 at p. 5) That is because consumers must obtain a prescription by undergoing an examination by a licensed optometrist or ophthalmologist prior to obtaining prescription eyewear (glasses or contact lenses). According to market research reviewed by Dr. Rubinfeld, most purchases are preceded by an eye exam and most consumers prefer to buy their eyewear at the same place they obtain their eye examination and eyewear prescription. (Id. at pp. 4, 14, 17–19) Because plaintiffs cannot offer eye examinations in their retail stores, they are at a competitive disadvantage that deprives them of additional market share. (Id. at p. 20) Dr. Rubinfeld further opines that the plaintiffs suffer from reduced customer visits and decreased revenues when in restrictive states, such as Tennessee, as compared to non-restrictive states. (Id. at pp. 24–25).

Along similar lines, plaintiffs assert that Tenn.Code.Ann. § 63–8–113(c)(6) serves as a complete barrier to entry for some interstate firms. For example, America's Best, an interstate optical goods chain not party to this litigation, operates in the value segment of the retail optical industry. It offers low prices by delivering at low cost and by utilizing relatively inexpensive real estate, small efficient space and efficient staff. For example, America's Best employs the same receptionist for the optical dispensary and the optometrist's office. In addition, America's Best provides staff to the optometrist to assist in maintaining patient records. America's Best has also attracted customers by combining eyewear and eye exams into one package price. America's Best would like to expand into the Tennessee market but does not believe that it can operate effectively here due to the two-door restriction.

Likewise, For Eyes Optical, another interstate retail optical goods store that is not a party, has considered operating stores in Tennessee and would like to do so. However, For Eyes has not entered

the Tennessee market primarily because of the two-door restriction.

As additional evidence of the negative economic effects of Tenn.Code.Ann. § 63–8–113(c)(6), plaintiffs cite two studies that the Federal Trade Commission (FTC) undertook in 1975 and 1980 on the economic effects of state regulation of the retail market for optical goods. Regulations examined by the FTC during the studies included: (1) advertising restrictions; (2) consumers' access to their ophthalmic prescription; and (3) restrictions on optometric practice in commercial settings. The FTC concluded from the studies that "commercial practice restrictions resulted in higher prices for eyeglasses and eye examinations, but did not increase their quality." Additionally, research conducted by the FTC's Bureau of Economics showed that prices were 18% higher "in markets where chain firms are totally restricted than in markets where chain firms operate freely." The FTC attributed the higher prices to "inefficiencies of an industry protected from competition by state regulation." In particular, the FTC found that restrictions on practicing in commercial locations "impose[d] unnecessary space, construction, or personnel costs that must be passed on to consumers." The FTC further found that, as a result of higher prices, "consumers obtain eye care less frequently than they otherwise would." When consumers do decide to seek eye care, their access to such care is also affected by commercial practice restraints because the restraints restrict the places where an optometrist may locate. The FTC found that commercial optometrists may be more conveniently located and may be more frequently available on weekends and evenings. (Docket No. 163 at Exs. 35, 36)

Finally, plaintiffs assert that they incur additional capital and operating costs as a result of having to construct and operate two-door stores. Specifically, LensCrafters has estimated that it costs $26,950 more per store to construct a two-door store than a one-door store. Cole incurs between $1,500 and $2,000 in extra fixtures for two-door Sears Optical locations and between $500 and $800 in extra fixtures costs for two-door Target Optical locations. Pearle Vision incurs extra fixture costs between $500 and $800 when it remodels a two-door store as opposed to a one-door store.

When building a two-door store, plaintiffs also must find a space that is sufficient in size and location to accommodate a two-door location. Some optometrists are hesitant to work at two-door locations where the outside entrance to the optometrist's office opens directly onto a dark parking lot or is distant from the retail store. Once the two-door stores are built, plaintiffs incur increased operating costs due to the need to maintain two offices as opposed to one office alone.

### H. Putative Benefits of Tenn.Code. Ann. § 63–8–113(c)(6)

In support of the statute, defendants presently argue that the prohibition on optometric practice in retail and other commercial establishments:

1. ensures that the practice of an optometrist licensed in Tennessee will not be controlled by a non-licensed entity;

2. ensures the continuity of the doctor-patient relationship;

3. maintains the integrity of the optometric profession;

4. ensures 24–hour access to an optometrist's office;

5. ensures that an unregulated entity will not interfere in the doctor-patient relationship; and

6. eliminates confusion in the public as to the source of optometry services.

Defendants assert that the benefits of the statute were recognized by the Tennessee Supreme Court in *LensCrafters v. Sundquist*, 33 S.W.3d 772. There the Court found that the prohibition on practice in retail establishments serves to shield optometrists from the risk of control by an unlicensed entity. The court further found that allowing optometrists to practice in conjunction with businesses "in the practice of dispensing opticians" may involve a compromise of the optometrist's professional autonomy and would risk subordinating the standards of the optometry profession to the influence of commercial interests operated by lay business persons rather than by health care professionals.[9]

As evidence that retail optical establishments, in fact, have intruded into the practice of the optometrists to whom they sublease space, defendants proffer several examples, which plaintiffs have not refuted.[10] For example, many of the plaintiffs have reviewed the optometrist's appointment book, scheduled appointments for the optometrist, dictated the hours and days that the optometric practice must be staffed, and prohibited the optometrist from working at any other optometric locations. There is also evidence in the record that some patients have been unclear about the relationship between plaintiffs and the optometrists to whom they rent space. Some Cole Vision employees have access to a leasing optometrist's patient records. Another optometrist allows his patient records to be located inside of a J.C. Penney Optical Store operated by U.S. Vision. U.S. Vision employees have access to and sometimes access those files, ostensibly to verify a prescription. With regard to at least one of the optometrists with whom U.S. Vision has entered an Equipment Lease, U.S. Vision employees have suggested that the optometrist recommend coating and tinting to his patients. With regard to at least some of the optometrists to whom Wal–Mart leases office space, Wal–Mart employs all of the office staff who work in the optometrists' offices. These employees maintain patient records and the appointment book.

The plaintiffs dispute whether the prohibition on optometric practice in retail and commercial establishments confers any benefits whatsoever. They note that, although states often justify their commercial practice restrictions on the basis that "they are necessary to maintain high-quality vision care," the FTC's 1980 study found that "the record is quite clear on this central issue: There is no difference in the average quality of care available to consumers in restrictive and non-restrictive markets." (Docket No. 163, Ex. 36 at 10290)

9. According to LensCrafters' own market research, most customers who buy their eyewear from dispensing optometrists and ophthalmologists cite "trust" as their reason for doing so. (Docket No. 163, Ex. 2 at p. 15 n. 32).

10. Defendants have proffered additional examples of optical retailers' interference with the practice of the optometrists to whom they lease space, but these examples have been disputed by the plaintiffs. Notably, however, plaintiffs acknowledge that Eye Clinic 20/20, Inc., an in-state optical retailer, entered into a lease with one of its optometrists that: (1) guarantees an annual income of $75,000; (2) requires him to schedule patients every 15 minutes; (3) requires him to accept exam fees established by Eye Clinic 20/20; (4) requires him to recommend UV protection, progressives, anti-reflective coating, polarization, and all state-of-the-art products to every applicable patient without regard to cost; (5) requires him to recommend premium products without regard to the patient's ability to pay for such products; and (6) requires him to permit Eye Clinic 20/20 to advertise his services. (Docket No. 202 at p. 63)

The 1980 study was based, in part, on research undertaken by the FTC's Bureau of Economics in conjunction with optometrists on the faculties of the New York and Pennsylvania Colleges of Optometry. The study used 19 researchers who "posed as consumers and purchased over 400 eye exams and over 230 pairs of eyeglasses from optometrists in twelve different metropolitan areas across the country," including Knoxville, Tennessee. The study found "no significant difference" in material components of eye care, including "the accuracy of prescriptions, the accuracy and workmanship of eyeglasses, the extent of unnecessary prescribing, and the ability to detect eye problems and pathologies."

According to the plaintiffs, "[t]he results of the Bureau of Economics study confirmed the FTC's expectations about the relationship, or lack thereof, between restrictions and quality of care[.]" In this regard, the study concluded:

There is no apparent *a priori* reason why one would expect these restrictions on business practices to affect the quality of professional care. Both commercial and noncommercial optometrists have similar licensing examinations in order to practice. Commercial optometrists face the same incentives as noncommercial optometrists to satisfy consumer demand and provide an acceptable quality of eye care. Private optometrists, like commercial firms, must earn a profit in order to stay in business and both types of practitioners seek to generate profits by selling eyewear. Practitioners in both groups must maintain a good reputation in order to attract and hold the loyalty of patients.

(Docket No. 163, Ex. 36 at 10291)

Based upon the 1975 and 1980 studies, the FTC promulgated a final rule in 1989 declaring four types of state-imposed restrictions on commercial practices to be unfair acts or practices. State restrictions on practice in commercial settings was one of the restrictions declared illegal. The FTC justified its promulgation of the Rule on the basis that it would be good for competition and, in turn, consumers:

As restrictions on commercial practice are removed, competition among optometrists should increase. Lower prices should then result from this increased competition and from economies of scale achieved by larger optometric providers. Lower prices will also increase the availability of ophthalmic goods and services to consumers who before could afford services infrequently, or in some instances, not at all.

(Docket No. 163, Ex. 36 at 10290) The FTC noted that an additional benefit to consumers flowing from enactment of the Rule was that "consumers will benefit from their ability to choose, if they wish, the convenience of one stop service (eye examinations plus eyeglass or contact lens dispensing) from optometrists or retail optical firms who employ optometrists." (Docket No. 163, Ex. 36 at 10303)

The FTC's Rule was challenged by the American Optometric Association, the California Optometric Association, and several states. *See California State Board of Optometry v. FTC*, 910 F.2d 976 (D.C.Cir. 1990). The optical associations and states challenged the Rule on statutory and constitutional grounds and also "attack[ed] the factual record upon which the FTC based its decision to adopt the rule." The Court vacated the Rule on the ground that the FTC lacked statutory authority to promulgate it. The court did not address the petitioners' alternative argument that the factual record upon which the FTC based the Rule was deficient. Thus, the plaintiffs assert that the FTC's findings in support of the Rule have never been invalidated or overruled.

As additional evidence that the prohibition on practice in retail establishments is of no benefit, the plaintiffs note that some present and former members of the Tennessee Board of Optometry testified in deposition that they did not know the purpose or benefits of the prohibition. Indeed, many Board members admit that they have no evidence that optometrists who practice in retail establishments provide a lower quality of care than optometrists who do not.[11] Moreover, the plaintiff's expert, Dr. G. Richard Bennett, is of the opinion that the restrictions on practice in commercial settings may actually have a negative effect on the health, safety, and welfare of Tennessee citizens.

Plaintiffs further assert that dispensing optometrists are no less subject to commercial pressures than their counterparts who lease space from retail optical establishments. Notably, the optometrist defendants in this case reported that 90–98% of their eyewear customers also are eye care patients and that 40–60% of their profits result from optical goods sales. Additionally, there is evidence that dispensing optometrists engage management consultants to assist them in increasing the profitability of their dispensaries.

For example, Professional Vision Group (PVG) is a management consulting firm whose principal, Richard Omohundro, is not an optometrist. PVG has had approximately 24 Tennessee optometric practices and one Tennessee ophthalmology practice purchase its consulting services in the past ten years. It currently has five customers in Tennessee. Two current members of the Board and one past member have purchased PVG's practice management services. PVG has offered a continuing education course called "Merging Professionalism With Profits" to members of the Tennessee Optometric Association. PVG charges dispensing optometrists $1,500 per month for its practice management consulting services. PVG advises its clients that, to grow their practice, they should work on improving their referral base, patient recall, and revenue per patient. PVG also teaches optometrists on how to increase revenue from the sale of eyewear.

PVG taught Board Chair Dr. Richt how to use a lifestyle dispensing system to increase revenue from eyewear sales. Lifestyle dispensing has two components: asking a patient about his or her particular visual demands, and then educating the patient about the various eyewear options available to meet those visual demands. Other members of the Board also ask their patients about their lifestyle while administering eye examinations. In addition, some Board members use patient questionnaires to obtain information from patients about their hobbies, occupation, and social activities. These questionnaires are available to the optometrists' dispensing staff.

Other optometrist Board members have designed the layout of their offices so that patients move from the waiting room, to a pretesting area, to the examination room, to the dispensary, and, finally, to checkout. Three of the optometrist Board members personally escort their patients to the dispensary. There the optometrist, the patient, and a dispensary technician engage in a three-way conversation about the patient's prescription and eyewear needs. Several Board members also cross-train some of their staff members to work in their dispensary. In some cases, Board members offer their dispensary staff bonuses for selling lens upgrades,

---

**11.** All optometrists are subject to the same education and licensure requirements regardless of where they practice.

lens add-ons, and higher-priced frames. One former member candidly admits that the purpose of commissions is to encourage selling and to increase the dispensary's revenue.

Plaintiff's expert Dr. Bennett is of the opinion that "some of the more difficult problems that arise with spectacle prescription happen in settings where there is no continuity between the prescribing doctor and the dispensing optician." Important information about a patient's visual requirements may not be shown on a prescription; when there is a break in the continuity of care, this information may not be communicated to the necessary persons. All of the optometrist Board members agree that it is in the patient's best interest for the examining optometrist to make recommendations to their patients about appropriate eyewear and explain available lens options.

Furthermore, several Board members testified that they participate in managed care plans that place limitations on the goods and services that they may provide to their patients. One former Board member testified that he believes managed care creates pressure to see more patients due to low compensation. Plaintiffs' expert Dr. Bennett stated that managed care allows non-licensed entities to control the frequency of examinations, referrals to specialists, the availability of diagnostic tests, and availability of specific medicines—the very evils at which the prohibition on practice in commercial establishments is directed.

Finally, plaintiffs argue that the Board's history of not enforcing Tenn.Code.Ann. § 63–8–113(c)(6) undercuts any claim that the statute serves a beneficial purpose.

I. *History of Enforcement of Tenn. Code.Ann. § 63–8–113(c)(6)*

In March 1991, the Board of Optometry voted to send a letter to "commercial establishments who provide optometric services," requesting that they provide the Board with the names of all optometrists practicing within their facilities and copies of any financial agreements between the commercial establishments and the optometrists. In response to the Board's letter, plaintiffs LensCrafters and Pearle each advised the Board that they do not employ optometrists and were not, to the best of their knowledge, acting in violation of the optometry statutes.

On July 23, 1991, the Board sent a memorandum to all Tennessee licensed optometrists advising them that the state Attorney General had determined that the prohibition against practice in or in conjunction with retail establishments was constitutional and enforceable. The stated purpose of the memorandum was:

> To notify all those who are practicing in [retail stores or other commercial establishments where merchandise is displayed or offered for sale] that they are in conflict with the Tennessee Optometric Practice Act. It is the Board's duty to enforce the Practice Act regarding this violation as well as other violations and the Board intends to pursue this purpose.

In 1991 and 1992, the Board Consultant, in conjunction with the Office of General Counsel (OGC) of the Department of Health, opened complaints against several optometrists who were allegedly practicing in conjunction with Wal–Mart stores. All of the complaints were closed on the condition that the optometrists close off access to their offices from Wal–Mart's Vision Centers and offer access to their offices only from outside of the stores. None of the optometrists was required to change the terms of leases or compensation agreements. Nor were they required to alter their treatment of their patients.

In 1991, the OGC and the Board Consultant opened twelve (12) complaints against optometrists affiliated with LensCrafters, twenty-three (23) complaints against optometrists affiliated with Pearle, and one complaint against an optometrist affiliated with Sears Optical. Investigations were undertaken in only eight of the 36 cases. The OGC and Board Consultant determined that no violations of the Optometry Practice Act had occurred. This determination was made, even though some of the optometrists' offices could only be accessed from inside the retail store in which they were located.

On July, 6, 1993, Patricia Crotwell sent a complaint to the Department of Health concerning Dr. Jeffrey Rothman, who subleases space from LensCrafters at Rivergate Mall in Goodlettsville, Tennessee. Ms. Crotwell complained that Dr. Rothman had refused to release her contact lens prescription so that she could have it filled elsewhere, an act which she believed was a violation of the Optometry Practice Act. Ms. Crotwell also stated that she believed that Dr. Rothman was violating the prohibition against practice in a retail or commercial setting because his office was located "inside the LensCrafters building . . . [with] no discernable separate entrance." The OGC and Board Consultant recommended that an investigation go forward on the alleged violation of the prohibition against practicing inside of a retail establishment. On April 25, 1995, an investigator finally paid a visit to Dr. Rothman's office at the Rivergate Mall. The investigator also spoke with Dr. Rothman by phone. At that time, Dr. Rothman informed the investigator that LensCrafters had replaced the interior door between his office and the LensCrafters store with an open archway in 1994 when it had remodeled. On June 23, 1995, the Board Consultant recommended that formal disciplinary action be initiated against Dr.

Rothman for "practicing in a retail establishment."

On March 6, 1996, a Notice of Charges and Memorandum of Assessment of Civil Penalty was filed against Dr. Rothman. Dr. Rothman was charged with a violation of the Optometry Practices Act based upon the fact that his office "has not been physically separated from the retail establishment operated by LensCrafters." After a hearing before an Administrative Law Judge, the Board found Dr. Rothman in violation of the statute by a vote of 3 to 1.

The Board further voted that to comply with the statute, Dr. Rothman must:

1. cause to be constructed an entrance into his office from the exterior of the building located at 910 Two Mile Parkway, Goodlettsville, Tennessee so as to allow patients to enter his practice without entering the retail establishment operated by LensCrafters.

2. cause to be constructed a continuous wall, or such wall as to be necessary to provide a continuous wall between the area [of] his office and that portion of the building occupied by LensCrafters, at the premises set forth above, to include a door which is both closeable and lockable.

Dr. Rothman was ordered to make the modifications to his office within 30 days after entry of the Board's order and was assessed a total penalty of $1,000.

When directed by the Administrative Law Judge to articulate a "public welfare" reason for its ruling, the Board stated that it "feels it is important for the public to have access to their optometrists, and the care the optometrist supplies, without being influenced by a retail establishment."

The Board's order was stayed and eventually overturned on petition for review by the Chancery Court. The state Attorney

General refused to defend the Board's order in the Chancery Court proceedings, arguing that the Board had incorrectly construed the statute. The Attorney General argued that the statute should be construed "only as banning optometrists from practicing 'in, or in conjunction with, any retail store or other commercial establishment' that is not engaged primarily in the practice of dispensing opticians." This argument was eventually rejected by the Tennessee Supreme Court in *LensCrafters v. Sundquist* as will be discussed *infra.*

*J. Procedural History*

On February 19, 1998, LensCrafters filed suit, challenging the constitutionality of Tenn.Code Ann. § 63–8–113(c)(6) as violative of the Fourteenth Amendment's Equal Protection and Due Process Clauses and the Commerce Clause of Article I of the United States Constitution. LensCrafters seeks injunctive relief under 42 U.S.C. § 1983 against the operation and continued enforcement of Tenn.Code Ann. § 63–8–113(c)(6) and a declaration under 28 U.S.C. § 2201 that Tenn.Code Ann. § 63–8–113(c)(6) is unconstitutional.

LensCrafters' suit in federal court was prompted by the state disciplinary action initiated by the Board against Dr. Rothman. While Dr. Rothman's suit was pending in Chancery court, LensCrafters filed the instant suit here in federal court.[12]

On July 27, 1998, the defendants filed a Motion to Dismiss, arguing that LensCrafters could not satisfy the case or controversy requirement or, in the alternative, that LensCrafters' case was moot. (Docket No. 18) On December 14, 1998, Chief Judge Echols denied their Motion to Dismiss, finding that LensCrafters had standing to challenge the constitutionality of the statute. (Docket No. 25)

On January 8, 1999, the case was transferred to this court. On February 8, 1999, defendants filed their first Motion for Summary Judgment. (Docket No. 29) In support of their first Motion for Summary Judgment, the defendants primarily argued that summary judgment should be granted in their favor because the court could decide the case without reaching the constitutional issues raised by LensCrafters. As framed by the defendants, the issue for the court was whether LensCrafters should be considered a "retail store or other commercial establishment" for purposes of Tenn.Code Ann. § 63–8–113(c)(6). On this issue, defendants asked the court to ignore the Board's construction of this statutory provision in the proceedings against Dr. Rothman, wherein it stated that Tenn.Code Ann. § 63–8–113(c)(6) prohibited an optometrist from practicing "in, or in conjunction with" a business such as LensCrafters. Instead, the defendants asserted that the court should follow the interpretation of § 63–8–

---

12. In the state court proceedings in Chancery Court, the Attorney General submitted a response to Dr. Rothman's Amended Petition for Review that did not oppose reversal of the Board's final order and stated that the Board's construction of the statute raised constitutional issues which could be avoided by an alternative construction of the statute.

On June 25, 1998, the Davidson County Chancery Court reversed the Board's final order, finding that the Board's construction of Tenn.Code Ann. § 63–8–113(c)(6), which prohibited Dr. Rothman from practicing "in, or in conjunction with" LensCrafters, could not be justified. The Chancery Court further found that a "corporation engaged primarily in the business of selling and dispensing ophthalmic lenses and frames is in the 'practice of dispensing opticians' and, therefore, is not a 'retail store or other commercial establishment' within the meaning of Tenn.Code Ann. § 63–8–113(c)(6)." (Docket No. 19, Ex. C at 27–28) The Chancery Court's construction of the statute was later rejected by the Tennessee Supreme Court in response to a certified question from this court.

113(c)(6) adopted by the Chancery Court in *Rothman v. Tennessee Bd. of Optometry.* (Defendants' Mem. at 5) Implicit in the defendants' arguments was the belief that the Board's construction of § 63–8–113(c)(6) rendered the statute unconstitutional.[13]

In response, LensCrafters asserted that, even if the court were to adopt such a reading of Tenn.Code Ann. § 63–8–113(c)(6), LensCrafters would still not be protected from future harm, since the court's interpretation of this statutory section would not be binding on state courts. Accordingly, LensCrafters sought to have the question of whether LensCrafters is to be considered a "retail store or other establishment" for purposes of Tenn.Code Ann. § 63–8–113(c)(6) certified to the Tennessee Supreme Court.

The court agreed with LensCrafters and certified the following question to the Tennessee Supreme Court:

> Whether an entity engaged primarily in the business of selling and dispensing ophthalmic lenses and frames is a "retail store or other commercial establishment" within the meaning of Tenn.Code Ann. § 63–8–113(c)(6)?

In their briefs to the Tennessee Supreme Court, both parties argued that it would be unconstitutional to construe the statute to include entities such as LensCrafters. The Tennessee Supreme Court disagreed and stated:

> The parties in this case contend that this Court should interpret Tenn.Code Ann. § 63–8–113(c)(6) to exclude businesses which sell ophthalmic lenses and frames because a contrary interpretation would render the statute unconstitutional. They contend that the restriction against practicing in or in

conjunction with a retail store discriminates against out-of-state stores, thereby unduly burdening interstate commerce. We begin by discussing the constitutional aspects of the parties' construction of the statute.

The states are allowed great leeway under their police power to adopt regulations that protect the health and safety of their citizens. Although the Constitution confers "upon Congress the regulation of commerce, ... [it was] never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960), quoted in *Head v. New Mexico Bd. of Exam. in Optometry,* 374 U.S. 424, 428, 83 S.Ct. 1759, 1762, 10 L.Ed.2d 983 (1963). Although regulations adopted under the police power may indirectly impose a burden on interstate commerce, they are not unconstitutional unless they are shown to "discriminate against interstate commerce or operate to disrupt its required uniformity." *Huron Portland Cement Co.,* 362 U.S. at 448, 80 S.Ct. at 818.

The statutory regulations on optometry pertinent here in effect insulate optometrists from non-health care commercial entities. The purpose of this insulation is to prohibit the formulation of business relationships between optometrists and such entities. The policy supporting such prohibitions is that preservation of an unbroken relationship between the professional and the patient is best achieved by shielding the profes-

---

**13.** It is important to note, however, that at that time Governor Sundquist was the primary defendant and he was represented by the Attorney General's Office. Commissioner Wadley is now the primary defendant, and representation of the defendants has been transferred to a private law firm.

sional from the risk of control by an unlicensed person or entity. *See Cole Vision v. Dept. of Bus. and Prof.,* 688 So.2d 404, 409 (Fla.Dist.Ct.App.1997).

A review of analogous precedent shows that regulations prohibiting optometrists from practicing optometry as a servant of an unlicensed optical business, though affecting interstate commerce, have been held to be constitutional. *See Pearle Optical of Monroeville, Inc. v. Georgia State Bd. of Examr's in Optometry,* 219 Ga. 364, 133 S.E.2d 374 (1963); *Sears, Roebuck & Co. v. State Bd. of Optometry,* 213 Miss. 710, 57 So.2d 726 (1952); *see also* 61 Am.Jur.2d Physicians, Surgeons, etc. § 157 (1981); 88 ALR 2d 1290, 1294 § 3[a], 1963 WL 13503. In upholding the constitutionality of a statute prohibiting those "engaged in the business of retailing merchandise" from renting out space for eye examinations, the United States Supreme Court stated:

It seems to us that this regulation ... is an attempt to free the profession, to as great an extent as possible, from all taints of commercialism. It certainly might be easy for an optometrist with space in a retail store to be merely a front for the retail establishment. In any case, the opportunity for that nexus may be too great for safety, if the eye doctor is allowed inside the retail store. Moreover, it may be deemed important to effective regulation that the eye doctor be restricted to geographical locations that reduce the temptations of commercialism. Geographical location may be an important consideration in a legislative program which aims to raise the treatment of the human eye to a strictly professional level. We cannot say that the regulation has no rational relation to that objective and therefore is beyond constitutional bounds.

*Williamson v. Lee Optical of Okla. Inc.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955).

Our Court has stated similar concerns justifying such regulations when addressing the question of optometrists being employed by corporations:

The logical result would be that corporations and business partnerships might practice law, medicine, dentistry or any other profession by the simple expedient of employing licensed agents. And if this were permitted professional standards would be practically destroyed, and professions requiring special training would be commercialized, to the public detriment. The ethics of any profession is based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character.

*State ex rel. Loser v. National Optical Stores Co.,* 189 Tenn. 433, 225 S.W.2d 263, 269 (1949).

We conclude that even were the statute to prohibit the practice of optometry in LensCrafters's stores, it would still be constitutional. Therefore, our construction of the statute is not affected by constitutional concerns.

*LensCrafters, Inc. v. Sundquist,* 33 S.W.3d at 775–77.

After disposing of the constitutional challenge, the Tennessee Supreme Court turned to the proper construction of Tenn. Code Ann. § 63–8–113(c)(6). On this issue, the Court opined:

Here, the natural and ordinary meaning of the language used, "any retail store ... where merchandise is ... of-

fered for sale," would include ophthalmic superstores such as LensCrafters. The parties maintain, despite the absence of language exempting ophthalmic stores, that the intent of our legislature in enacting the provision before us was to prevent optometrists from practicing in department stores and not stores which specialize in selling ophthalmic supplies.

To support their assertion that applying Tenn.Code Ann. § 63–8–113 to ophthalmic stores would be inconsistent with the statutory scheme considered as a whole, the parties point to sections of our Code which suggest an "overlap" between the work of dispensing opticians and optometrists. The parties note that LensCrafters is a business "in the practice of dispensing opticians" under Tenn.Code Ann. § 63–14–102 and thus is allowed to prepare, adapt, and dispense lenses, spectacles, eye glasses, frames, and optical devices. They further note that opticians are permitted to practice as employees of businesses "in the practice of dispensing opticians" if they are "under the actual and personal supervision of partners, officers, managers or stockholders who possess valid unrevoked licenses as dispensing opticians entitled to practice in [Tennessee]." *See* Tenn.Code Ann. § 63–14–103(d) (1997). Thus, LensCrafters may sell ophthalmic lenses and frames and may employ opticians who dispense ophthalmic lenses and frames.

Likewise, the parties note that optometrists are permitted to employ dispensing opticians. *Id.* § 63–14–105 ("Nothing contained in this chapter shall be construed to prohibit a . . . licensed optometrist from employing a licensed dispensing optician as defined in this chapter."). Moreover, they note that selling glasses has long been a part of the practice of optometry and that the statutory scheme contemplates that optometrists should be allowed to sell ophthal-

mic lenses and frames. *See id.* § 63–8–102(12)(D). Thus, like businesses "in the practice of dispensing opticians," optometrists also may hire opticians to sell and dispense ophthalmic lenses and frames.

The basic thrust of the parties' argument is that the statutes governing opticians and optometrists are inconsistent because they allow a business "in the practice of dispensing opticians" to hire dispensing opticians and sell ophthalmic products, and they allow an optometrist to hire dispensing opticians and sell ophthalmic products, but they do not allow a business "in the practice of dispensing opticians" to form a business association with an optometrist. The parties contend that the similarities between optometrists and businesses "in the practice of dispensing opticians" render unjustifiable any argument that relationships between such businesses and optometrists would degrade the profession of optometry.

The parties fail, however, to recognize that allowing optometrists to practice in conjunction with businesses "in the practice of dispensing opticians" may involve a compromise of the optometrists' professional autonomy. Such does not occur when an optometrist operates an independent business which employs opticians to dispense and sell ophthalmic lenses and frames. *Cf.* Tenn.Code Ann. § 63–8–113(c)(2), (5) (1997 Repl.). Furthermore, there is no statute condoning an optometrist's professional association with or employment by dispensing opticians. *See id.* § 63–8–113. The reason for this is that opticians are not health care professionals; they are specifically prohibited from examining eyes or diagnosing, treating, or correcting "any human ailment . . . or physical condition." *Id.* § 63–14–102(2). Consequently, although optometrists permissibly may

employ dispensing opticians, to allow optometrists to form business associations with dispensing opticians-or with businesses "in the practice of dispensing opticians," such as LensCrafters—would be equivalent to allowing optometrists to form business associations with non-health care provider commercial entities. By allowing such business associations, we would risk subordinating the standards of the optometry profession to the influence of commercial interests operated by lay business persons rather than by health care professionals.

In holding that businesses which sell ophthalmic lenses and frames are retail establishments within the meaning of Tenn.Code Ann. § 63–8–113(c)(6), we must also address whether this interpretation renders the optometry statute internally inconsistent. Although this argument was not raised by the parties, one might assert that optometrists are allowed to sell lenses and frames within their own practice, Tenn.Code Ann. § 63–8–102(12), and yet by doing so, they violate the prohibition against practicing in a "retail store ... where merchandise is ... offered for sale." However, we decline to hold that this inconsistency requires that the phrase "retail store or other commercial establishment" be interpreted to exclude stores engaged primarily in the business of selling and dispensing ophthalmic lenses and frames. · A more reasonable interpretation is that the phrase "retail and commercial establishments" refers to "non-health care profession" commercial entities. We reach this conclusion in large part by reference to Tenn.Code Ann. § 63–8–113(c)(2), which implicitly allows an optometrist to be employed by persons and entities "engaged primarily in health care delivery." This construction of the statute prevents the "lay control of optometrists" advances the goal of encouraging a direct line of re-

sponsibility from licensed optometrists to their patients, and further allows optometrists to practice in professional associations with other licensed health care professionals who are not only in the practice of health care delivery, but who also sell ophthalmic products.
*LensCrafters, Inc.,* 33 S.W.3d at 777–79.

While the certified question in *LensCrafters* was pending before the Tennessee Supreme Court, plaintiffs U.S. Vision, Cole Vision, and the NAOO filed a separate action challenging the constitutionality of Tenn.Code. Ann. § 63–8–113(c)(6). That action was initially stayed pending the Tennessee Supreme Court's resolution of the certified question put to it in *LensCrafters.* Subsequently, the two cases were consolidated.

On March 14, 2002, plaintiffs filed a consolidated Second Amended Complaint seeking both declaratory and injunctive relief. (Docket No. 127) In their Consolidated Complaint, plaintiffs again challenge Tenn.Code Ann. § 63–8–113(c)(6), which they refer to as the "Eye Exam Prohibition" or "EEP", as violative of three separate constitutional provisions: (1) the Dormant Commerce Clause; (2) the Equal Protection Clause; and (3) the Due Process Clause.

Plaintiffs have moved for summary judgment in their favor only on the Dormant Commerce Clause challenge. Defendants have filed a cross-motion for summary judgment on all three challenges.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *McLean v. 988011 Ontario, Ltd.,* 224 F.3d 797, 800 (6th Cir.2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC,* 219 F.3d 547, 551 (6th Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.,* 187 F.3d 533, 537–38 (6th Cir.1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon,* 107 F.3d 1171, 1174–75 (6th Cir.1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."

*Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.* at 255, 106 S.Ct. at 2513.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street,* 886 F.2d at 1479. "There is no genuine issue for trial unless the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.,* 227 F.3d 700, 703 (6th Cir.2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson,* 477 U.S. at 249–252, 106 S.Ct. at 2510–12. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White,* 190 F.3d 427, 430 (6th Cir.1999) (citations omitted).

In ruling upon cross-motions for summary judgment, this court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.

## III. ANALYSIS

### A. Law of the Case

■ As a threshold matter, the defendants generally argue that the constitutionality of the Tenn.Code.Ann. § 63–8–113(c)(6) was decided by the Tennessee Supreme Court in *Lenscrafters,* 33 S.W.3d 772, and that this court is bound by the Tennessee Supreme Court's holding because it constitutes the law of the case. This argument is without merit.

Although the cases cited by the defendants on this issue do hold that a state court's answer to a certified question constitutes the law of the case, none of the cases involved state courts resolving a party's federal constitutional challenge incident to answering the questions certified to them. Therefore, the cases cited by the defendant do not hold that a state court's answer to a certified question on matters of state law constitutes law of the case as to federal issues initially presented in federal court pleadings.

In any event, plaintiffs were entitled to reserve the right to return to federal court for resolution of their federal constitutional claims under the Supreme Court's decision in *England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 421, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1964).[14] In this case, LensCrafters' brief to the Tennessee Supreme Court specifically advised the Justices that it reserved the right to further challenge the constitutionality of Tenn.Code.Ann. § 63–8–113(c)(6) in subsequent federal proceedings, should it be necessary for them to do so. Although defendants argue that the plaintiffs waived this right by arguing the constitutional issue in the state court proceedings, the Sixth Circuit has suggested that the law of the case doctrine is not applicable when a state court is informed in advanced that its resolution of a specific issue may be treat-

ed as advisory. *See Grover by Grover v. Eli Lilly and Co.,* 33 F.3d 716, 719 (6th Cir.1994) ("A federal court that certifies a question of state law should not be free to treat the answer as merely advisory unless the state court specifically contemplates that result.") Thus, the court will proceed to the merits of plaintiffs' claims.

### B. Scope of Tenn.Code Ann. § 63–8–113(c)(6)

■ Turning to the merits of plaintiffs' claims, the court must first determine the true scope of prohibition set forth in Tenn. Code Ann. § 63–8–113(c)(6). This determination must be made at the outset of the court's analysis because it affects the purposes, burdens, and benefits that may be ascribed to the statute.

According to the plaintiffs, Tenn.Code Ann. § 63–8–113(c)(6) requires only that they physically separate themselves from the optometrists with whom they contract—even though the statute prohibits optometrists from practicing "in, or in conjunction with, any retail store or other commercial establishment where merchandise is displayed or offered for sale." In other words, the "in conjunction with" prohibition has never been given independent meaning and, thus, the statute is satisfied when the optometrist's office is separated from plaintiffs' retail stores by a wall and the optometrist's office has a separate entrance.[15] Defendants, on the other hand,

---

**14.** Justice Breyer, when he was seated on the First Circuit Court of Appeals, explained the holding of *England* as follows:

> That case permits a plaintiff who files a case in federal court before state proceedings begin to tell the state court that it wishes to litigate its federal claim in that federal court; it thereby permits the federal court to engage in *Pullman* (not *Younger*) abstention, a form of abstention that permits the federal court, in effect, to ask a state court to clarify a murky question of state law involved in the case, while permitting the plaintiff to return to the federal

forum for determination of the federal question after the state court has decided the issue of state law. *See id.;* 17A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 4243, at 72–81 (1988 & Supp.1989).

*Duty Free Shop, Inc. v. Administracion De Terrenos De Puerto Rico,* 889 F.2d 1181, 1182–83 (1st Cir.1989).

**15.** Plaintiffs argue that this is the meaning that has long and consistently been ascribed to the statute by the Board of Optometry and that the Board cannot change that interpreta-

deny that the statute imposes a physical separation requirement alone.

■ The court agrees with the defendants that physical separation may satisfy that part of the statute that prohibits optometrists from practicing "in" a retail establishment, but the physical separation requirement alone does not satisfy the requirement that optometrists not operate "in conjunction with" such an establishment. On this issue, the Tennessee Supreme Court has determined that "in conjunction with" has independent meaning. *See LensCrafters*, 33 S.W.3d at 779 n. 9. ("'in conjunction with' is defined to mean being joined together in an association) (citing Black's Law Dictionary 765 (6th ed.1990)).[16] Thus, to satisfy the statute, an optometrist must operate independently of a retail optical establishment, not just occupy a physically separated office.[17]

### C. Equal Protection Clause Challenge

■ Defendants move for summary judgment on plaintiffs' claim that Tenn. Code.Ann. § 63–8–113(c)(6) violates the Equal Protection Clause. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir.2002). In this case, the challenged legislation is presumed valid if the classification of groups is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249. On this issue, defendants correctly argue that the Supreme Court has rejected an equal protection challenge to an Oklahoma statute substantially similar to Tenn.Code Ann. § 63–8–113(c)(6). *See Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). In that case, the Court stated:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. *Tigner v. State of Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the

tion now for tactical advantage. (Docket No. 200 at pp. 32–35)

16. Because the Tennessee Supreme Court has spoken on the issue, the court rejects plaintiffs' arguments that the Board has consistently construed the statute to require only physical separation and that the Board's construction is binding upon this court. After all, it is hornbook law that state supreme courts are the final authority on the meaning of state statutes and constitutions. *Cf. Int'l Longshoremen's Assn. v. Davis*, 476 U.S. 380, 387, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986) (court has no authority to review state determinations of purely state law).

17. Plaintiffs appear to recognize that the Tennessee Supreme Court construed Tenn.Code. Ann. § 63–8–113(c)(6) to prohibit optometrists from forming associations with optical retailers at footnote 24 of their Brief in Opposition to Defendants' Motion for Summary Judgment. (Docket No. 200) Although plaintiffs dismiss the Tennessee Supreme Court's construction as *dicta* and argue that such a construction "would prohibit a simple sublease between an optometrist and any landlord whose business is retail," the court finds both arguments without merit. First, the Tennessee Supreme Court's construction of the challenged provision was encompassed within the question certified to it. Second, barring optometrists from forming associations with retail establishments would not prohibit optometrists from leasing space from a retail establishment, unless the lease contained provisions seeking to link the optometrist to the retailer through shared personnel, rental provisions seeking a share of gross receipts, etc.

reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. *Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. *A.F. of L. v. American Sash & Door Co.,* 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further than invidious discrimination. We cannot say that that point has been reached here. For all this record shows, the ready-to-wear branch of this business may not loom large in Oklahoma or may present problems of regulation distinct from the other branch.

*See Williamson v. Lee Optical,* 348 U.S. at 489, 75 S.Ct. 461; *see also Wall v. Hardwick,* 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974) (affirming *Wall v. American Optometric Ass'n, Inc.,* 379 F.Supp. 175 (N.D.Ga.1974) (3–judge court)).

Plaintiffs acknowledge that "[i]t is certainly true that the Supreme Court upheld a statute similar to the EEP in *Williamson v. Lee Optical* .... However, unlike the instant case, there was no evidence that the statute was passed for a protectionist purpose. Here, the evidence is that the purpose of the EEP was to eliminate competition from interstate retailers. This is not a legitimate purpose and the EEP cannot stand." Plaintiffs offer no authority in support of their argument that a statute may be invalidated under the Equal Protection Clause based upon evidence that the statute was passed for a protectionist purpose. In any event, their evidence of discriminatory motive is weak at best. *Cf. Eastern Ky. Resources v. Fiscal Court of Magoffin Cnty.,* 127 F.3d 532, 543 (6th Cir.1997). Significantly, defendants have cited legislative history indicating that the Tenn.Code.Ann. § 63–8–113(c)(6) was intended to apply to in-state retail stores leasing space to onsite optometrists, as well as out-of-state retail stores leasing space to onsite optometrists.[18] Accordingly, plaintiffs' Equal Protection Claim will be dismissed.

### D. Due Process Challenge

■ Defendants also move for summary on plaintiffs' claim that Tenn.Code.Ann. § 63–8–113(c)(6) violates substantive due process.[19] The Sixth Circuit has articulated the following framework for analyzing substantive due process claims:

> Substantive due process "serves as a vehicle to limit various aspects of potentially oppressive government action." *Howard v. Grinage,* 82 F.3d 1343, 1349 (6th Cir.1996); *see Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986). Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that "shock the conscience." *Pusey v. City of Youngstown,* 11 F.3d 652, 656 (6th Cir.1993), cert. denied, 512 U.S. 1237, 114 S.Ct. 2742, 129 L.Ed.2d 862 (1994); *Mansfield Apartment Owners Ass'n v. City of Mansfield,* 988 F.2d 1469, 1474 (6th Cir.1993). Where government action does not deprive a plain-

---

**18.** This evidence does not necessarily undermine plaintiffs' Commerce Clause challenge, as courts routinely reject Equal Protection and Substantive Due Process challenges, while finding violations of the Dormant Commerce Clause. *See, e.g., McNeilus Truck &* *Mfg., Inc. v. Ohio ex rel. Montgomery,* 226 F.3d 429, 444 (6th Cir.2000).

**19.** As stated *supra,* the plaintiffs have not moved for summary judgment in their favor on this claim or the Substantive Due Process Claim.

tiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest. *See, e.g., Reno v. Flores,* 507 U.S. 292, 301–05, 113 S.Ct. 1439, 1446–49, 123 L.Ed.2d 1 (1993); *In re Blue Diamond Coal Co.,* 79 F.3d 516, 521 (6th Cir.1996); *Galas v. McKee,* 801 F.2d 200, 205 (6th Cir.1986). *Valot v. Southeast Local School Dist.,* 107 F.3d 1220, 1228 (6th Cir.1997).

Again, the defendants rightfully note that the Supreme Court has twice rejected substantive due process challenges to state statutes substantially similar to Tenn.Code Ann. § 63–8–113(c)(6) on the grounds that such statutes are rationally related to the state's goal of insulating health care professionals from commercial influences. *See Wall v. Hardwick,* 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134; *Williamson v. Lee Optical,* 348 U.S. at 486, 75 S.Ct. 461. And, again, the plaintiffs offer no meritorious response. Consequently, this claim, too, will be dismissed.

### E. Dormant Commerce Clause Challenge

Both parties move for summary judgment on plaintiffs' claim that the Tenn. Code.Ann. § 63–8–113(c)(6) impermissibly discriminates against interstate commerce in violation of the Commerce Clause.

The Interstate Commerce Clause vests Congress with the exclusive authority to regulate commerce among the several states. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). The Commerce Clause has a negative or dormant component that the Supreme Court has ruled generally precludes state regulation of or discrimination against interstate commerce. *Welton v. Missouri,* 91 U.S. (1 Otto.) 275, 23 L.Ed. 347 (1875).

■ The Supreme Court has created a two-step analysis of dormant commerce

clause claims. The first step requires courts to determine whether the challenged action discriminates against interstate commerce. This discrimination may take one of three forms. The challenged statute or action might: (1) facially discriminate against out-of-state goods or services, (2) have a primary purpose of discrimination, or (3) have a discriminatory effect. *See Eastern Ky. Resources,* 127 F.3d at 540. The second step involves determining the correct level of scrutiny applicable to the challenged governmental action. *See id.* If the statute or action by the government discriminates in any of the three ways listed above, reviewing courts will apply the "strictest scrutiny." *Or. Waste Sys., Inc. v. Dept. of Env. Quality of the State of Or.,* 511 U.S. 93, 101, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

■ Plaintiffs bear the initial burden of showing that Tenn.Code.Ann. § 63–8–113(c)(6) has a discriminatory purpose or effect on interstate commerce. *See Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). If the plaintiffs meet that burden, then the government bears the burden of establishing that the challenged government action "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Or. Waste Sys., Inc.,* 511 U.S. at 101, 114 S.Ct. 1345 (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).

If the plaintiffs fail to show that the Tenn.Code.Ann. § 63–8–113(c)(6) discriminates against interstate commerce, the court then must apply the balancing test announced in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). In *Pike,* the Supreme Court ruled that nondiscriminatory regulations that only incidentally burden commerce are valid "unless the burden imposed on such

commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174.

*1. Whether Tenn.Code Ann. § 63–8–113(c)(6) regulates or affects interstate commerce*

■ In footnote 13 of their Memorandum in Support of Defendants' Motion for Summary Judgment, the defendants assert that Tenn.Code Ann. § 63–8–113(c)(6) "does not regulate, or 'substantially affect,' commerce but rather is an exercise of the state's police power to regulate the practice of optometry, a learned profession." (Docket No. 176) With no citation to factual support in the record or authority so holding, defendants baldly assert a Dormant Commerce Clause challenge cannot be sustained "because the practice of optometry within a retail store has no 'substantial effect' upon commerce." This argument lacks merit. The United States Court of Appeals for the District of Columbia Circuit has upheld federal regulations requiring optometrists to provide their patients with copies of their prescriptions, *see American Optometric Ass'n v. FTC,* 626 F.2d 896 (D.C.Cir.1980), thereby implicitly rejecting the argument that the profession of optometry is exempt from federal commercial regulation. *Cf. Lewis v. BT Investment Mgrs., Inc.,* 447 U.S. 27, 42, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) ("Thus, it is not surprising that ever since the early days of our Republic, the States have chartered banks and have actively regulated their activities. Nonetheless, it does not follow that these same activities lack important interstate attributes.").

*2. Whether Tenn.Code Ann. § 63–8–113(c)(6) is facially discriminatory*

Plaintiffs do not argue that the statute is facially discriminatory. Thus, this is not an issue the court needs to address.

*3. Whether Tenn.Code Ann. § 63–8–113(c)(6) has a discriminatory purpose*

■ Plaintiffs argue that the legislative history of the statute and documents obtained from the Tennessee Optometric Association (TOA) demonstrate that the statute was proposed and adopted for the purpose of giving a competitive advantage to Tennessee optometrists who offer optical goods for sale incident to their practice—at the expense of out-of-state competitors such as Sears, Woolworths, etc. Defendants object to the TOA documents as unauthenticated hearsay, an objection that the court has sustained. In addition, defendants note that one of the sponsors of the bill also stated that "an optometrist's customers will not leave him if he moves from Harvey's Department Store [a locally owned entity] to a professional building." (Docket No. 197 at p. 13) Defendants also argue that the Tennessee Supreme Court has already determined that the statute has a benign purpose.

Plaintiffs' evidence of discriminatory intent is equivocal at best. *See McNeilus Truck & Mfg.,* 226 F.3d at 443 (discussing extrinsic evidence of discriminatory purpose). If anything, the legislative history demonstrates that the proponents of the legislation were concerned with optometrists who practiced in or in conjunction with any retail establishments, regardless of who owned those establishments. Accordingly, no factfinder could reasonably conclude that Tenn.Code Ann. § 63–8–113(c)(6) was adopted for discriminatory purposes. *See Eastern Ky. Resources,* 127 F.3d at 542–43 ("When a party seeks to present circumstantial evidence of discriminatory purpose pursuant to a dormant Commerce Clause challenge, it is the duty of that party to show the effect of that evidence on the challenged statute. In this case, EKR has failed to carry its

burden.") (internal citations omitted). *See also Reynolds v. Buchholzer*, 87 F.3d 827, 831 (6th Cir.1996) ("Regarding the statutes at issue, the Ohio Supreme Court has confirmed that the legislative purpose is '[o]bviously ... protection and conservation of wildlife, a legitimate state interest.' *Port Clinton Fish Co.*, 538 N.E.2d at 1057. With the deference given to the stated goals of legislation, the plaintiffs would have a difficult time proving that the Ohio legislature was motivated by other ends.").

### 4. Whether Tenn.Code Ann. § 63–8–113(c)(6) has discriminatory effects

The main point of contention on this issue is whether the statute regulates even-handedly. The thrust of the defendants' argument is that Tennessee licensed optometrists, who may sell optical goods incident to their practice, are not similarly situated to retail optical goods stores because the former are healthcare providers and the latter are not. In support of this argument, defendants rely primarily upon a Fifth Circuit case, *Ford Motor Co. v. Texas Dept. of Trans.*, 264 F.3d 493 (5th Cir.2001), which, in turn, relies primarily upon the Supreme Court case of *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978).

The Sixth Circuit has interpreted the holding of *Exxon* as follows:

> In *Exxon* the Supreme Court upheld the constitutionality of a Maryland "divestiture" statute that flatly prohibited a producer or refiner of petroleum products from operating any retail gasoline service station within the state. Major oil companies such as Exxon were thus required to divest themselves of their direct retail gasoline operations in the State of Maryland. There did not happen to be any Maryland-based petroleum producers or refiners—a circumstance that made it plausible, to say the least, for Exxon and other major oil companies to argue, as they did, that the

statute was unconstitutional because its effect was "to protect in-state independent dealers from out-of-state competition." *Exxon*, 437 U.S. at 125, 98 S.Ct. 2207.

> Plausible though the argument may have been, the Supreme Court rejected it. "[T]he fact that the burden of the divestiture requirements falls solely on interstate companies," the Court concluded, "... does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level." *Id.*

> The *Exxon* Court pointed out that the Maryland statute created no barriers against competition from interstate independent retailers—which is to say that although local Maryland retailers were being protected against competition from the major integrated oil companies, the local retailers were not being protected against competition from a small number of interstate companies that chose to engage solely in gasoline retailing. This circumstance, in the Court's judgment, "fully distinguish[ed]" Exxon from cases such as *Hunt v. Washington Apple Adver. Comm'n*, [ 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)] If any integrated oil companies had been based in Maryland, moreover, they would have been barred from the retail business just as every other producer-refiner was. This was "a most critical factor in Exxon," the Supreme Court subsequently suggested. *See Lewis v. BT Investment Mgrs., Inc.*, 447 U.S. 27, 42, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980)...

> ... *At the very least, it seems to us, Exxon shows a willingness on the part of the Supreme Court to engage in some fairly fine slicing and dicing of the practical effects of state legislation in order to avoid the necessity of finding the legislation discriminatory. Exxon*

*also manifests an obvious reluctance to push cases such as Hunt v. Washington Apple Adver. Comm'n to their logical extremes.*

Maharg, Inc. v. Van Wert Solid Waste Management Dist., 249 F.3d 544, 553–54 (6th Cir.2001) (emphasis added).

The foregoing passage demonstrates that the Sixth Circuit's reading of the *Exxon* decision is substantially in accord with the Fourth Circuit's reading of *Exxon* in the *Ford Motor Co.* case. *Compare id.* and *Ford*, 264 F.3d at 500–502. That is *Exxon* requires courts to compare similarly situated entities when considering a claim that a law discriminates against interstate commerce. In this case, the similarly situated entities are optical stores owned by in-state interests and optical stores owned by out-of-state interests. It is beyond dispute that Tenn.Code.Ann. § 63–8–113(c)(6) applies equally to these two entities. The law prohibits optometrists from leasing space inside any optical store, regardless of whether the store is owned by residents or nonresidents.[20]

As the Supreme Court stated in *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87–88 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987):

> The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce. *See, e.g., Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015–2016, 64 L.Ed.2d 702 (1980); *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535–2536, 57 L.Ed.2d 475 (1978).

*See generally* Regan, THE SUPREME COURT AND STATE PROTECTIONISM: MAKING SENSE OF THE DORMANT COMMERCE CLAUSE, 84 Mich.L.Rev. 1091 (1986). The Indiana Act is not such a statute. It has the same effects on tender offers whether or not the offeror is a domiciliary or resident of Indiana. Thus, it "visits its effects equally upon both interstate and local business," *Lewis v. BT Investment Managers, Inc., supra*, 447 U.S., at 36, 100 S.Ct., at 2015. Dynamics nevertheless contends that the statute is discriminatory because it will apply most often to out-of-state entities. This argument rests on the contention that, as a practical matter, most hostile tender offers are launched by offerors outside Indiana. But this argument avails Dynamics little. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978). *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471–472, 101 S.Ct. 715, 727–728, 66 L.Ed.2d 659 (1981) (rejecting a claim of discrimination because the challenged statute "regulate[d] evenhandedly . . . without regard to whether the [commerce came] from outside the State"); *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 619, 101 S.Ct. 2946, 2954, 69 L.Ed.2d 884 (1981) (rejecting a claim of discrimination because the "tax burden [was] borne according to the amount . . . consumed and not according to any dis-

---

**20.** Conversely, any Tennessee licensed optometrist may operate a dispensary incident to an optical practice, regardless of whether that Tennessee licensed optometrist resides in Tennessee, in one of the eight states that border Tennessee, or in any other state. *See* Tenn. Code.Ann.63–8–115 (Tennessee residency not listed as a requirement to obtain optometry

license). For example, a Tennessee licensed optometrist who practices in Clarksville may choose to live across the state line in Kentucky, one who practices in Memphis, across the state line in Arkansas, and one who practices in Chattanooga, across the state line in Georgia.

tinction between in-state and out-of-state consumers"). Because nothing in the Indiana Act imposes a greater burden on out-of-state offerors than it does on similarly situated Indiana offerors, we reject the contention that the Act discriminates against interstate commerce.

Such is the case here.

Plaintiffs argue that they are similarly situated with dispensing optometrists nonetheless because they and dispensing optometrists compete in the retail market for the sale of optical goods. They further assert that "there is no reason why the status of Tennessee optometrists as regulated healthcare professionals in treating and diagnosing conditions of the eye should justify extending to them a regulatory monopoly on providing the 'one-stop shopping' for eye examinations that the majority of eyewear customers desire." (Docket No. 200 at p. 8) In support of this argument, plaintiffs note that the Tennessee Supreme Court determined in *LensCrafters* that "the production and sales of ophthalmic lenses and frames does not constitute the delivery of health care." *See LensCrafters*, 33 S.W.3d at 778.

Plaintiffs, however, ignore the fact that optometrists exert complete control over what happens in their dispensaries and may be held accountable for the operations of their dispensaries and their employees who work there. If a dispensing optometrist's employees disclose a patient's histo-ry of venereal disease, a health condition that may be diagnosed in an eye exam and recorded on the patient's chart, the optometrist can discipline or fire that employee. If the dispensing optometrist allows the employees in his dispensary to violate patient confidentiality with abandon, the optometrist can be disciplined. On the other hand, optometrists who merely lease space from a retail optical store cannot control the store's employees or be held accountable for the conduct of those employees.

That there may be valid reasons for allowing optometrists, as regulated medical professionals, to operate dispensaries incident to their practices is underscored by the fact that plaintiffs do not challenge an ophthalmologist's ability to likewise operate a dispensary. Though an optometrist may obtain a different educational degree than an ophthalmologist, the two are equally regulated healthcare professionals, and all of plaintiffs' arguments as to why an optometrist should not be able to operate a dispensary apply equally to an ophthalmologist. Accordingly, the court rejects plaintiffs' argument that plaintiffs and dispensing optometrists must be treated as similarly situated simply because dispensing optometrists are allowed to sell optical goods incident to their practice of optometry and, thus, compete for the same customers as retail optical stores. *Cf. General Motors Corp. v. Tracy*, 519 U.S. 278, 303–04, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997).[21]

21. In *Tracy*, the Supreme Court also considered entities that competed in one market but not another. The Court rejected the argument that any competition between the two entities rendered them similarly situated, reasoning that the market in which the two entities competed was not the most significant market. Thus, the Court held:

In sum, the LDCs' bundled product reflects the demand of a market neither susceptible to competition by the interstate sellers nor likely to be served except by the regulated natural monopolies that have historically supplied its needs. So far as this market is concerned, competition would not be served by eliminating any tax differential as between sellers, and the dormant Commerce Clause has no job to do. There is, however, a further market where the respective sellers of the bundled and unbundled products apparently do compete and may compete further. Thus, the question raised by this case is whether the opportunities for competition between marketers and LDC's in the noncaptive market

Because the court has determined that plaintiffs are not similarly situated to dispensing optometrists, the court need not consider plaintiffs' arguments that Tenn. Code.Ann. § 63–8–113(c)(6) discriminates against their business model and that defendants have failed to proffer evidence that the statute is the least discriminatory measure available to serve the purposes of the statute.

#### 5. Whether Tenn.Code Ann. § 63–8–113(c)(6) satisfies the Pike balancing test

 Under the *Pike* balancing test, the court must determine whether "the burden imposed on [interstate] commerce is clearly excessive to the putative benefits" of the challenged statute. *Pike*, 397 U.S. at 142, 90 S.Ct. 844. Plaintiffs bear the burden of proof on this issue.

Generally speaking, the state asserts that the Tenn.Code.Ann. § 63–8–113(c)(6) "prevent[s] the control of optometrists, who are licensed healthcare professionals, by unlicensed, nonhealthcare persons or entities," such as the plaintiffs. (Docket No. 176 at p. 3). Plaintiffs, on the other hand, assert that the statute imposes the following burdens upon out-of-state optical firms such as themselves: (1) "construction costs and increased rent" associated with building and maintaining two-door stores; (2) "lost revenue associated with

being unable to offer one-stop eyewear, a convenience customers prefer and good patient care demands, and that their primary competitors can and do offer;" (3) "barriers to market penetration because out-of-state optical firms cannot find suitable store locations;" and (4) "the barrier to market entry because out-of-state optical firms cannot do business in Tennessee at all." (Docket Nos. 200 at pp. 37–38, 164 at pp. 12–15) Plaintiffs assert that "[t]he magnitude of these burdens is in the *tens of thousands of dollars per year per store.*" (Docket No. 200 at p. 38) (emphasis in original). First, the specific burdens identified by the plaintiffs will be addressed and then, the putative benefits proffered by the defendants.

Plaintiffs first assert that they incur substantial capital and operating costs as a result of complying with the prohibition against optometric practice in a retail establishment. For instance, plaintiffs have to build out and lease more space and are unable to obtain economies of scale if they wish for their customers to have convenient access to optometrists and the eye exams that they provide. But these same costs are imposed upon any optical store wishing to operate in the state of Tennessee, whether it is owned by an in-state or an out-of-state interest. Moreover, plaintiffs can obtain economies of scale only by engaging in the very practices the act

requires treating marketers and utilities as alike for dormant Commerce Clause purposes. Should we accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate? Although there is no *a priori* answer, a number of reasons support a decision to give the greater weight to the captive market and the local utilities' singular role in serving it, and hence to treat marketers and LDC's as dissimilar for present purposes. First and most important, we must recognize an obligation to proceed cautiously lest we imperil the delivery by

regulated LDC's of bundled gas to the noncompetitive captive market. Second, as a Court we lack the expertness and the institutional resources necessary to predict the effects of judicial intervention invalidating Ohio's tax scheme on the utilities' capacity to serve this captive market. Finally, should intervention by the National Government be necessary, Congress has both the resources and the power to strike the balance between the needs of the competitive and captive markets.

519 U.S. at 303–04, 117 S.Ct. 811. The Court's reasoning is equally applicable to this case.

without doubt was designed to prohibit, such as the sharing of personnel and coordination of advertising between the optometrist and optical store. Such practices can rationally be expected to compromise the optometrist's ability to control his or her staff and the advertising of his or her professional services.

Indeed, the plaintiffs' own evidence supports such a conclusion. For example, under Wal-Mart's leases with its optometrists, Wal-Mart is responsible for hiring, firing, and supervising all of the employees who assist the optometrist. (Docket No. 202 at p. 190) In addition, leases between two of the plaintiffs and the optometrists to whom they lease respectively provide that "[a] portion of Tenant's rent is utilized by Landlord as payment for advertising by Landlord of the availability of Tenant's services. Advertising by Landlord is solely within the discretion of Landlord" and "Landlord may, in its sole discretion, advertise the availability of Tenant's services." (Docket No. 202 at p. 45) [22]

As for plaintiffs' claims to lost revenue, plaintiffs offer some evidence that LensCrafters and Pearle Vision stores located in states with restrictions similar to Tennessee's, bring in monthly gross revenues that are, on average, $12,000 and $8,000, lower than similar stores located in states with no such restriction. Significantly, plaintiffs proffer no evidence on whether Tennessee stores are any more or less *profitable* than stores in states that allow optometrists to sublease space inside retail optical stores. In any event, the regression analysis completed by Dr. Rubinstein produced an $R^2$ factor of only .03. Thus, the restrictions imposed by Tenn.Code. Ann. § 63–8–113(c)(6) account for only a portion of the differences in revenue. Moreover, it may be that LensCrafters and Pearle are losing revenues in Tennessee to out-of-state chains such as Wal-Mart, rather than to dispensing optometrists.

The last two burdens identified by the plaintiffs, barriers to market penetration and to market entry by certain optical stores, are easily dispensed with because they were rejected in *Exxon*.[23] *See Exxon*, 437 U.S. at 127, 98 S.Ct. 2207. The Court's analysis on this issue is as follows:

> Appellants argue, however, that this fact does show that the Maryland statute impermissibly burdens interstate commerce. They point to evidence in the record which indicates that, because of the divestiture requirements, at least three refiners will stop selling in Maryland, and which also supports their claim that the elimination of company-operat-

---

**22.** On a related note, plaintiffs maintain that "interstate optical firms have an economic incentive to offer quality goods and services because their business model depends heavily on having a good reputation. Reputation is a form of economic investment." But the Supreme Court has specifically held that "[t]he Constitution does not require the States to subscribe to any particular economic theory." *CTS Corp.*, 481 U.S. at 92, 107 S.Ct. 1637. And, like the Supreme Court, this court is "not inclined 'to secondguess the empirical judgments of lawmakers concerning the utility of legislation.'" *Id. (quoting Kassel v. Consolidated Freightways Corp.*, 450 U.S., at 679, 101 S.Ct., at 1321 (Brennan, J., concurring in judgment)). Thus, the possibility that some

optical firms may seek to interfere with the practice of optometrists to whom they lease space is enough. *See id.* ("In our view, the possibility of coercion in some takeover bids offers additional justification for Indiana's decision to promote the autonomy of independent shareholders.")

**23.** Plaintiffs also assert that there can be no benefit to the statute because the Executive Director of the Tennessee Optometric Association testified that the organization took no position on the merits of the legislation. As defendants point out, however, Mr. Odom was not deposed as a corporate representative.

ed stations will deprive the consumer of certain special services. Even if we assume the truth of both assertions, neither warrants a finding that the statute impermissibly burdens interstate commerce.

Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

Here, too, there is no reason to expect that the loss of an America's Best or a J.C. Penney Optical store will not be made up for by the opening of a LensCrafters or Pearle Vision store.

Finally, it must be observed that plaintiffs fail to put forth any real argument that the statute impedes the flow of optical wear into the state of Tennessee.[24] *See Exxon*, 437 U.S. at 127–28, 98 S.Ct. 2207 ("We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. As indicated by the Court in *Hughes*, the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.") (internal citation omitted). *Cf. McNeilus Truck & Mfg.*, 226 F.3d at 442 ("The statute at issue here definitely threatens to slow the flow of out-of-state remanufactured vehicles into Ohio, an effect that distinguishes the statute from others that have been

upheld under dormant-Commerce-Clause analysis.")

The best plaintiffs offer in their briefs is a footnote stating that, "[i]n addition, fewer goods move in commerce, because—as the FTC recognized—the more accessible eyecare is, the more people obtain it. Thus, this case does not involve merely a transfer of eyewear dollars—albeit from out-of-state to in-state entities—but effects a barrier to the import of eyewear into Tennessee." (Docket No. 200 at p. 6 n. 5) And, in his expert report, plaintiff's economic expert, Dr. Rubinfeld, merely states:

> The Eye Exam Prohibition imposes burdens on interstate optical firms that are not also imposed on dispensing optometrists, their in-state competitors .... One would expect that these burdens would lead to lower unit sales and lower revenues for interstate optical firms. The evidence supports each of these predictions and the resulting impact on interstate commerce, including a decrease in the flow of eyeglasses or their components into the state of Tennessee.

(Docket No. 163, Ex. 2 at p. 31).

However, Dr. Rubinfeld's conclusion appears to be based upon the assertion that Tenn.Code.Ann. § 63–8–113(c)(6) increases the costs of eyecare and eyewear and, thus, decreases demand. Such reasoning has been rejected by the Supreme Court. *See Exxon Corp.*, 437 U.S. at 127–28, 98 S.Ct. 2207 ("It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce."). *Accord Georgia Manufactured*

---

24. The absence of such argument and evidence is puzzling, since the cases upon which the plaintiffs principally rely involved regulations which threatened to impede the flow of interstate goods into the regulating state or imposed geographically based restrictions. Without such persuasive argument, these cases become inapposite.

*Housing Ass'n, Inc. v. Spalding County, Ga.,* 148 F.3d 1304, 1308 (11th Cir.1998) ("resulting price increases of manufactured homes do not weigh heavily against the 4:12 requirement because price increases generally do not violate the dormant Commerce Clause").

And the evidence in the record does not support the conclusion that dispensing optometrists are any less likely to import their optical goods than out-of-state optical stores. The court notes, for example, that Dr. Richt purchases frames through a buying group in Mississippi in order to take advantage of volume discounts offered by the frame manufacturers. (Docket No. 202 at p. 89) Some dispensing optometrists may prefer to grind and finish their eyeglass lenses in-house, but plaintiff LensCrafters does as well. Finally, there is no evidence that, when it comes to grinding and finishing lenses, the net effect of the statute is to decrease interstate commerce. In sum, the court finds no evidence that Tenn.Code.Ann. § 63–8–113(c)(6) unconstitutionally impedes the flow of optical goods into the state of Tennessee. *Cf. Head v. New Mexico Bd. of Exam'rs in Optometry,* 374 U.S. 424, 429–30, 83 S.Ct. 1759, 1763, 10 L.Ed.2d 983 (1963)[25]

Turning to the putative benefits of the statute, plaintiffs devote a substantial amount of their argument and proof to disputing whether Tenn.Code.Ann. § 63–8–113(c)(6) serves to insulate optometrists from commercial influence or benefits consumers in any manner. (Docket Nos. 164 at pp. 27–36, 200 at pp. 13–31) They further argue that defendants have failed to identify any benefits that could not as easily be served by less discriminatory measures. (Docket Nos. 200 at pp. 36–37)

Plaintiffs first argue that the purposes advanced by the legislature—to upgrade the profession and avoid commercial interference with the doctor-patient relationship-have been abandoned or are unsubstantiated. In the first instance, the court does not consider the goal of "upgrading the profession" a separate rationale, but simply one aspect of isolating optometric practice from commercial influence. With respect to this issue, it may be true that optometrists are possessed of the same skills and experience regardless of where they practice. However, that does not negate the fact that an optometrist's professional judgment may be compromised when he associates himself with a commercial entity. For instance, the lease that Eye Clinic 20/20, Inc., entered into with one of its optometrists: (1) guarantees an annual income of $75,000; (2) requires him to schedule patients every 15 minutes; (3) requires him to accept exam fees established by Eye Clinic 20/20; (4) requires

---

**25.** In *Head,* the Court considered the validity of a New Mexico statute forbidding optometrists from advertising their services. The law was challenged by a Texas optometrist who wished to advertise his services in New Mexico newspapers. In upholding the validity of the law, the Court stated:

A state law may not be struck down on the mere showing that its administration affects interstate commerce in some way. "State regulation, based on the police power, which does not discriminate against interstate commerce or operate to disrupt its required uniformity, may constitutionally stand." *Huron Portland Cement Co. v. City* *of Detroit, supra,* 362 U.S., at 448, 80 S.Ct., at 818.

374 U.S. at 429, 83 S.Ct. 1759.

Significantly, the Court further stated:
Like the smoke abatement ordinance in the *Huron* case, the statute here involved is a measure directly addressed to protection of the public health, and the statute thus falls within the most traditional concept of what is compendiously known as the police power. *The legitimacy of state legislation in this precise area has been expressly established. Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563.

*Id.* (emphasis added).

him to recommend UV protection, progressives, anti-reflective coating, polarization, and all state-of-the-art products to every applicable patient without regard to cost; (5) requires him to recommend premium products without regard to the patient's ability to pay for such products; and (6) requires him to permit Eye Clinic 20/20 to advertise his services. (Docket No. 202 at p. 63)

This brings the court to plaintiffs' second attack on the asserted benefits of the statute, that the history of non-enforcement undercuts any contention of legitimate purpose. On this issue, plaintiffs note that the Board has not taken any action on the Eye Clinic 20/20 lease described above or on numerous other leases that impose restrictions upon optometrists. Nor has the Board consistently found a violation of Tenn.Code.Ann. § 63–8–113(c)(6) when the optometrist's office was accessed through an optical store.

The court can see no basis for finding that the avowed benefits of a statute duly enacted by the legislature may be undermined by poor enforcement on the part of the executive branch. If such were the case, the executive branch would be in a position to invalidate any law with which it disagreed. *Cf. New Hampshire v. Maine,* 532 U.S. 742, 755, 121 S.Ct. 1808, 1817, 149 L.Ed.2d 968 (2001); *Heckler v. Community Health Svcs. of Crawford Cty., Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.").[26]

It is for this same reason that the court also must reject the plaintiffs' arguments that the purported benefits of the statute are undermined by the fact that the state Attorney General did not believe that there was any benefit to prohibiting optometrists from leasing space inside of retail optical stores, and Board members were unable to identify or agree on the purpose of the prohibition.

Plaintiffs' next critique of the purported benefits of the statute is that those benefits are not advanced "by a wall separating the optometrist from the optical dispensary." (Docket No. 164 at p. 33) As stated *supra,* the Tennessee Supreme Court has determined that Tenn.Code.Ann. § 68–3–113(c)(6) prohibits optometrists not only from operating in retail stores but also from practicing "in conjunction with" retail stores. Thus, there is no merit to the argument that the statute may be satisfied merely by erecting a wall between the optometrist's office and the optical store.

As for plaintiffs' challenges to the specific harms identified by the defendants (Docket No. 200 at pp. 19–31), the criticisms leveled amount only to assertions that these harms do not really affect patient care; that patient confidentiality is not that important; that optometrists do not really need to dilate a patient's eyes; that it is perfectly acceptable for an optical store to dictate the number of hours than an optometrist's office shall be open as long as the optometrist can meet the requirement by hiring another optometrist; that it is no problem for an optical store to ask an optometrist to modify his prescription to fit the merchandise in stock; and that a consumer's confusion about the business relationship between an optometrist and the optical retail store from which

---

**26.** The Board also may be reluctant to initiate any measures to enforce Tenn.Code.Ann. § 63–8–113(c)(6) during the pendency of this lawsuit due to uncertainty about the legality of their actions.

he subleases space is an insignificant concern. In fact, the weakness of these assertions well illustrates the problem of lay persons or entities making decisions about what constitutes proper medical practice.[27]

Regardless of the plaintiffs' critique of the putative benefits of the challenged statute, the state is under no onerous duty to proffer evidence documenting that the benefits actually and demonstrably flow from Tenn.Code.Ann. § 63–8–113(c)(6). See Ford, 264 F.3d at 503 ("Consistent with the use of the term 'putative' in the Pike balancing [test], this Court will not 'second guess the empirical judgment of lawmakers concerning the utility of legislation.'") (quoting CTS Corp., 481 U.S. at 92, 107 S.Ct. 1637). As Justice Brennan explained in his concurring opinion in Kassel:

In determining those benefits, a court should focus ultimately on the regulatory purposes identified by the lawmakers and on the evidence before or available to them that might have supported their judgment. Since the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation, the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes. It is not the function of the court to decide whether in fact the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes.

450 U.S. at 680–81, 101 S.Ct. 1309 (citations omitted). Here the state's interest in restricting commercial interference with the conduct of a medical professional is an indisputably legitimate exercise of its police power, which has been historically recognized by the courts. Indeed, the Supreme Court repeatedly has held that states are empowered, under their police power, to prescribe the qualifications of who may practice medicine, using that term in its broadest sense to include all the healing arts, and the conditions under which they may do so. See, e.g., North Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973) (requirement that pharmacists own controlling interest in pharmacy); Head, 374 U.S. 424, 83 S.Ct. 1759 (restrictions on advertising of optometry services); Williamson, 348 U.S. 483, 75 S.Ct. 461 (prohibiting opticians from filling lenses without written prescription of optometrist or ophthalmologist); Douglas v. Noble, 261 U.S. 165, 43 S.Ct. 303, 67 L.Ed. 590 (1923) (licensing dentists); McNaughton v. Johnson, 242 U.S. 344, 37 S.Ct. 178, 61 L.Ed. 352 (1917) (excluding ophthalmologists from optometry); Collins v. Texas, 223 U.S. 288, 32 S.Ct. 286, 56 L.Ed. 439 (1912) (licensing osteopaths).

 The court is mindful, however, that in conducting the Pike balancing test, the state's invocation of an health or safety purpose does not insulate a state law from Commerce Clause attack. See Kassel, 450 U.S. at 670, 101 S.Ct. 1309. Rather the court must give "sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." Id. (internal citations and quotation marks omitted). Applying that dictate to the circumstances of this case, the court simply cannot conclude that the burdens imposed by Tenn.Code.Ann. § 63–

27. It may be that managed care also allows lay persons to interfere with the delivery of health care. But the Supreme Court "has made clear that a legislature need not strike at all evils at the same time or in the same way." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (internal citation and quotation marks omitted).

8–113(c)(6) clearly exceed the statute's putative benefits. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 474, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry. Only if the burden on interstate commerce clearly outweighs the State's legitimate purposes does such a regulation violate the Commerce Clause."); *Scariano v. Justices of Supreme Court of State of Ind.*, 38 F.3d 920, 924 (7th Cir.1994) (courts should treat state efforts to preserve professional integrity with deference). The statute may serve its ends imperfectly and may be unwise in some or many respects, but it is not an unconstitutional infringement on interstate commerce.

## IV. CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Docket No. 176) will be granted, and plaintiffs' Motion for Summary Judgment (Docket No. 164) will be denied.

In addition, plaintiffs' Motion to Supplement the Record (Docket 212) will be denied, and defendants' Motion for Relief from Local Rule 8(b)(7) (Docket No. 209) will be granted, while defendants' Motion to Strike (Docket No. 209) will be denied. Because defendants' Motion for Summary Judgment disposes of all claims, defendants' Motion for Advisory Jury (Docket No. 179) will be denied as moot, as will plaintiffs' Motion for a Status Conference (Docket No. 216).

An appropriate Order shall Enter.

### MEMORANDUM and ORDER ON MOTION TO AMEND

Pending before the court is the plaintiffs' Motion to Alter or Amend (Docket No. 224), to which the defendants have responded (Docket No. 226) and plaintiffs have replied (Docket No. 228).

### *Analysis*

Plaintiffs argue that the court erred in finding Exhibits 73, 74, 75, and 76 to plaintiffs' Motion for Summary Judgment to be inadmissible evidence. Plaintiffs further argue that this evidence establishes that Tenn.Code.Ann. § 63–8–113(c)(6) was enacted for the purpose of benefitting in-state economic interests, in violation of the Dormant Commerce Clause. Defendants counter that these exhibits were rightfully excluded as unauthenticated hearsay. Alternatively, defendants argue that, even if these Exhibits are deemed admissible, they fail to establish that Tenn.Code.Ann. § 63–8–113(c)(6) was enacted for discriminatory purposes.

Upon review of the parties' arguments and the exhibits at issue, the court concludes that Exhibits 73, 74, 75, and 76 are admissible as ancient documents under Fed.R.Evid. 803(16)[1] and 901(b)(8)[2]. These exhibits are more than 20 years old and were produced in response to a subpoena issued to the Tennessee Optometric Association. Thus, they indisputably satisfy the second and third requirements for

---

1. Fed.R.Evid. 803(16) provides that "[s]tatements in a document in existence twenty years or more the authenticity of which is established" are not excluded by the hearsay rule, even though the declarant is available as a witness.

2. Fed.R.Evid. 901(b)(8) provides for authentication where there is "[e]vidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered."

authentication under Fed.R.Evid. 901(b)(8). The only contested issue as to authentication under the ancient documents provision is whether these exhibits are "in such condition as to create no suspicion concerning authenticity." With respect to this issue, defendants argue that the exhibits do not appear to be final, approved minutes or correspondence because none of the exhibits are signed, that there are handwritten corrections on some of the exhibits, and that there appear to be pages missing from some of the exhibits. However, these challenges are best directed at the weight to be accorded to the documents by the factfinder, rather than whether the exhibits should be admitted in the first instance. *See Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 661 (6th Cir.2000); *Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1375–76 (3d Cir.1991). Accordingly, the court finds that the plaintiffs have made a *prima facie* showing that Exhibits 73, 74, 75, and 76 also satisfy the first requirement for authentication as ancient documents. Turning to the issue of hearsay, Fed.R.Evid. 803(16) provides that statements contained in an ancient document are not hearsay. Therefore, defendants' hearsay challenge is without merit.[3]

Although Exhibits 73, 74, 75, and 76 are admissible, the court is not persuaded that these exhibits establish that Tenn. Code.Ann. § 63–8–113(c)(6) was enacted for discriminatory purposes. At best, these exhibits provide evidence that the Tennessee legislature was concerned about dangers of optometrists practicing in, or in conjunction with, any commercial entity, regardless of in-state or out-of-state ownership. It is worth noting that this concern was recognized as legitimate by the United States Supreme Court in *Williamson v. Lee Optical of Okla. Inc.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955), some ten years before Tenn.Code Ann. § 63–8–113(c)(6) was adopted. In any event, plaintiffs have failed to establish how the activities of the TOA summarized in the exhibits impacted the legislative process so as to produce a discriminatory statute. *See Eastern Ky. Resources,* 127 F.3d at 542–43 ("When a party seeks to present circumstantial evidence of discriminatory purpose pursuant to a dormant Commerce Clause challenge, it is the duty of that party to show the effect of that evidence on the challenged statute.") (internal citations omitted). *See also Reynolds v. Buchholzer,* 87 F.3d 827, 831 (6th Cir.1996) ("Regarding the statutes at issue, the Ohio Supreme Court has con-

**3.** The Advisory Committee Notes summarize the rationale for excepting statements in ancient documents from the hearsay rule as follows:

Authenticating a document as ancient, essentially in the pattern of the common law, as provided in Rule 901(b)(8), leaves open as a separate question the admissibility of assertive statements contained therein as against a hearsay objection. 7 Wigmore § 2145a. Wigmore further states that the ancient document technique of authentication is universally conceded to apply to all sorts of documents, including letters, records, contracts, maps, and certificates, in addition to title documents, citing numerous decisions. Id. § 2145. Since most of these items are significant evidentially only insofar as they are assertive, their admission in evidence must be as a hearsay exception. But see 5 id. § 1573, p. 429, referring to recitals in ancient deeds as a "limited" hearsay exception. The former position is believed to be the correct one in reason and authority. As pointed out in McCormick § 298, danger of mistake is minimized by authentication requirements, and age affords assurance that the writing antedates the present controversy. *See Dallas County v. Commercial Union Assurance Co.,* 286 F.2d 388 (5th Cir.1961), upholding admissibility of 58–year–old newspaper story. *Cf.* Morgan, Basic Problems of Evidence 364 (1962), *but see id.* 254.

firmed that the legislative purpose is '[o]bviously ... protection and conservation of wildlife, a legitimate state interest.' *Port Clinton Fish Co.*, 538 N.E.2d at 1057. With the deference given to the stated goals of legislation, the plaintiffs would have a difficult time proving that the Ohio legislature was motivated by other ends."). Accordingly, admission of Exhibits 73, 74, 75, and 76 provides no basis for altering the court's conclusion that the defendants are entitled to judgment as a matter of law on plaintiffs' Dormant Commerce Clause claims.

## *Conclusion*

Plaintiffs' Motion to Alter or Amend (Docket No. 224) is GRANTED in part and DENIED in part. The Court's judgment of January 15, 2003 (Docket Nos. 220, 221) is amended to provide that Exhibits 73, 74, 75, and 76 to plaintiff's Motion for Summary Judgment are admissible. Because these documents do not alter the court's conclusion that defendants are entitled to judgment as a matter of law on plaintiffs' Dormant Commerce Clause claims, plaintiffs' Motion to Alter or Amend is denied in all other respects. This constitutes the final Order in this case.

It is so ORDERED.